THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| A.J., *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>CITY OF BELLINGHAM, *et al.*,<br><br>          Defendants. | CASE NO. C16-0620-JCC<br><br>ORDER ON SUMMARY JUDGMENT |

This matter comes before the Court on the motion for summary judgment by Defendants City of Bellingham, Clifford Cook, Dave Johnson, Kelli Linville, Zachary Serad, and Does 1-500 (Dkt. No. 19). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and, for the reasons explained herein, GRANTS the motion in part and DENIES the motion in part.

I.     BACKGROUND[1]

At the time of the events leading to this lawsuit, Plaintiff A.J. was 15 years old. (Dkt. No. 44 at 3.) On the evening of June 20, 2015, A.J. picked up his friends in his father's car and headed to Bellingham for a birthday party. (*Id.* at 2.) At about 10:40 p.m., A.J. drove the wrong way down a one-way street and was pulled over by Bellingham Police Department (BPD)

---

[1] The Court views the facts in a light most favorable to Plaintiffs, as is appropriate on summary judgment review. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986).

Officer Zachary Serad. (*Id.* at 3; Dkt. No. 28 at 9.) Officer Serad approached the car and asked A.J. to identify himself. (Dkt. No. 27 at 3.)

A.J.'s family is from Mexico, where it is traditional for a child to take both his father's and his mother's last names. (Dkt. No. 47 at 11.) Accordingly, A.J.'s full name is A. J. Zeferino. (*See id.*; *see also* Dkt. No. 27 at 12.) However, it is also common in Mexican practice to refer to people using only their father's last name, meaning that A.J. would be known in the community simply as A. J. (Dkt. No. 47 at 11.)

Thus, in response to Officer Serad's question, A.J. identified himself as A. J., without the name Zeferino. (*See* Dkt. No. 27 at 3.) When Officer Serad asked for A.J.'s date of birth, A.J. replied that it was August 6, 1996, and told Officer Serad that he was 18. (Dkt. No. 44 at 3.) A.J.'s actual birth date is August 6, 1999. (*Id.*) A.J. also gave Officer Serad his accurate home address. (*Id.* at 4-5.) Officer Serad was unable to locate any records based on this information. (*Id.* at 5.)

Officer Serad then asked A.J. if he had a current driver's license. (*Id.*) A.J. replied that he did not have a Washington license but did have one from California. (*Id.* at 6.) Officer Serad then asked A.J. if he had "any marks, scars, or tattoos a jail around here would be aware of?" (*Id.* at 8.) A.J. replied that he had never been booked into jail. (*Id.*) A.J. then produced his worker identification card, which displayed his name and photograph. (*Id.* at 8-9.) Officer Serad was again unable to locate any identifying records. (*Id.* at 12.)

Officer Serad once more asked A.J. to identify himself. (*Id.*) A.J. said his name was A.J. Zeferino and explained that Zeferino was his last name. (*Id.*) Apparently unaware of the aforementioned naming customs, Officer Serad took this to mean that A.J. had been lying about his name. (*See id.* at 12-13.) A.J. also admitted that he did not have a California driver's license. (*Id.* at 13.) Officer Serad told A.J., "I feel like you're lying to me, so my only recourse right now is to take you to jail and book you in and fingerprint you to verify who you are." (*Id.*) Officer Serad also explained to A.J. that he worried A.J. had "some warrants out for your arrest in

California or you're not permitted to be in the U.S., which I don't believe that's the case, but something's not adding up here." (*Id.* at 15.)

Officer Serad told A.J. to step out of the car. (*Id.* at 21.) He asked A.J., "When did you become a U.S. resident or are you one? It's kind of an important question for you." (*Id.*) A.J. replied that he was not a citizen, but that he had a pending application under the Deferred Action for Childhood Arrivals (DACA) program. (*Id.* at 21-22.) Officer Serad told A.J. to wait on the curb and said he was not free to leave. (*Id.* at 22, 24.) Officer Serad then called Border Patrol. (*Id.* at 23, 25.)

When two Border Patrol agents arrived, Officer Serad explained what had happened and told them that A.J. was undocumented. (Dkt. No. 44 at 5.) One of the agents told A.J., "I don't like people like you." (*Id.*) Officer Serad said to the agents, "There are three options here. I can give him a ticket and let him go, or I can take him in and do a fingerprint and find out who he is, or you guys can take him."[2] (*Id.*) Border Patrol replied that they would take A.J. (*Id.*) They handcuffed A.J. and placed him in their Jeep. (*Id.*) One of A.J.'s passengers had a valid driver's license and was able to drive the car home and inform A.J.'s parents what happened. (Dkt. No. 27 at 21; *see also* Dkt. No. 47 at 2.)

Border Patrol took A.J. to a jail in Whatcom County and put him in a cell. (Dkt. No. 44 at 6; Dkt. No. 47 at 6.) A.J. slept for a bit until an agent woke him up and took his fingerprints and photograph. (Dkt. No. 44 at 6.) The agent told him, "Your picture is going to go to the President." (*Id.*) A few minutes later, A.J. was told that he had no record and would be released the next day. (*Id.*)

A.J. called home. (*Id.* at 7.) It was around 2:00 a.m. (*Id.*) No one answered, so A.J. left a

---

[2] According to Officer Serad's declaration, A.J. "told me that he was 18-years-old and it never occurred to me that he was significantly younger than that — he certainly looked to be at least 18." (Dkt. No. 28 at 3.) Having observed A.J.'s appearance and demeanor on the traffic stop video, the Court finds this dubious. Moreover, given that Officer Serad repeatedly characterizes A.J. as dishonest, one would think he would question whether A.J. told the truth about his age.

message saying that he was pulled over in Bellingham, that Border Patrol took him, and that he could leave the next day but did not know where he was. (*Id.*)

At around 8:00 a.m., a Border Patrol agent told A.J. that he was going to the Federal Detention Center (FDC) in Tacoma. (*Id.*) The agent placed a leather shackle around A.J.'s waist and hooked the shackle to handcuffs around A.J.'s wrists. (*Id.*) They arrived at FDC Tacoma at almost 11:00 a.m. (*Id.* at 8.) A.J. was placed in a holding cell with over 80 people. (*Id.*) Someone from the front office told A.J. that he would be deported the next day. (*Id.*)

Meanwhile, A.J.'s parents, who do not speak English, were anxiously trying to find their son. (*See* Dkt. No. 47 at 3-5.) Border Patrol told them that A.J. was taken to the Immigration and Citizenship Services Administration Building in Tukwila. (*Id.* at 4.) A.J.'s parents drove to the building in Tukwila to find it closed, locked, and dark. (*Id.*) They returned home to Skagit County. (*See id.*) Later that day, Border Patrol informed them that A.J. was actually being held at FDC Tacoma. (*Id.* at 6.)

A couple hours after arriving at FDC Tacoma, A.J. was called into the front office. (*Id.* at 8-9.) An employee said to him, "We just got a call and they said you are 15, not 18, is that true?" (*Id.* at 9.) A.J. replied that it was. (*Id.*) A.J. was then able to call his parents to come get him. (*Id.*) He was placed in a private cell until 10:00 p.m., when he was released to his family. (*Id.*) A.J. described the experience as "awful" and stated that "[t]o this day, I am deeply frightened about what happened, as is my family." (*Id.*)

On April 28, 2016, A.J. brought the current suit with his parents, Antonio J. and Luciana Zeferino, as co-Plaintiffs.[3] (Dkt. No. 1 at 1.) They named as Defendants the City of Bellingham; Officer Serad, individually and in his official capacity; Bellingham Police Department Sergeant

---

[3] Defendants state in a footnote that A.J. is a minor and thus does not have legal capacity to sue on his own. (Dkt. No. 19 at 2 n.2.) The Court does not construe this as a formal motion asking the Court to take any action. It may be that A.J.'s parents' status as Plaintiffs is representative in nature. The Court makes no ruling on this issue at this time.

Dave Johnson, individually and in his official capacity; Bellingham Police Department Chief Clifford Cook, individually and in his official capacity; Bellingham Mayor Kelli Linville, individually and in her official capacity; and Does 1-500. (*Id.*) Plaintiffs alleged the following claims: (1) violation of 42 U.S.C. § 1983 as to all individual Defendants based on their violations of A.J.'s constitutional rights; (2) violation of 42 U.S.C. § 1983 as to Defendants Cook and Linville based on their supervision of Defendants Serad and Johnson, as well as their policies of racial discrimination; (3) racial discrimination under Washington Revised Code chapter 49.60 as to all Defendants; (4) negligence as to all Defendants; and (5) assault and battery as to all Defendants. (Dkt. No. 1 at 15-22.)

Defendants now move to dismiss all claims on summary judgment. (Dkt. No. 19.)

## II.   DISCUSSION

### A.   Summary Judgment Standard

The Court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party must present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248-49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

//

**B.    Analysis**

As a preliminary note, Plaintiffs have not named the Border Patrol as a defendant in this case. Thus, Plaintiffs' claims may be maintained on only the events that occurred up until the Border Patrol took custody of A.J. The Court's analysis reflects this.

      1.    Section 1983: Individual Defendants

Plaintiffs allege § 1983 claims against all individual Defendants, arguing that they violated A.J.'s rights under the Fourth, Fifth, and Fourteenth Amendments.[4] (Dkt. No. 1 at 16.) To establish liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that 1) the defendant acted under color of state law and 2) the defendant deprived the plaintiff of a right secured by the Constitution or laws of the United States. *Learned v. City of Bellevue,* 860 F.2d 928, 933 (9th Cir. 1988). Section 1983 liability generally arises only upon a showing of a defendant's personal participation in the alleged violations.[5] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Although Plaintiffs allege broadly that all individual Defendants committed violative actions, they plead no facts and provide no evidence of individual involvement by any Defendant other than Officer Serad. Thus, the Court DISMISSES the individual § 1983 claims against Defendants Johnson, Cook, and Linville.

Further, Plaintiffs plead no violations of A.J.'s parents' constitutional rights. Constitutional rights may not be asserted vicariously. *See Alderman v. United States*, 394 U.S. 165, 171-72 (1969) ("[T]he product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself."); *United States v. Fortna*, 796 F.2d 724, 732 (5th Cir. 1986) ("Fifth and Sixth Amendment rights, like Fourth Amendment rights, are personal in nature and cannot be asserted vicariously."); *Bryson v. United States*, 419

---

[4] Plaintiffs also allege a violation of A.J.'s Eighth Amendment rights. However, these claims are based on conduct that occurred after the Border Patrol took custody of A.J.

[5] In some circumstances, a supervisor or governing body may also be subject to liability under § 1983. These rules are addressed below in section II.B.2.

F.2d 695, 698-99 (D.C. Cir. 1969) ("Fifth Amendment rights are, a fortiori, personal rights"); *Bowman v. United States*, 350 F.2d 913, 915-16 (9th Cir. 1965) ("It has long been settled that the privilege against self-incrimination is personal to the witness."). Thus, the Court also DISMISSES the individual § 1983 claims brought by Antonio J. and Luciana Zeferino.

This leaves A.J.'s claims against Officer Serad. Defendants assert that the claims fail under the doctrine of qualified immunity. (Dkt. No. 19 at 7.) Qualified immunity acts as a bar against § 1983 claims insofar as the government official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "If the plaintiff cannot meet this burden, the inquiry ends and defendants are entitled to summary judgment." *Sepatis v. City and Cnty. of San Francisco*, 217 F. Supp. 2d 992, 997 (N.D. Cal. 2002).

*Fourth Amendment*: Plaintiffs first allege that Officer Serad unlawfully seized A.J. in violation of the Fourth Amendment. (Dkt. No. 49 at 18.) Plaintiffs argue that Officer Serad "violated A.J.'s constitutional rights by extending the duration of the stop, inquiring into matters unrelated to the justification of the stop, and restraining A.J. for the time it took for Border Patrol officials to arrive and take A.J. into custody." (*Id.*)

A.J. does not dispute that Officer Serad rightfully pulled him over. (*See* Dkt. No. 49 at 18.) "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). "Like a *Terry*[6] stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (internal citations omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop." *Id.* at 1615 (internal quotations omitted). "Typically such inquiries involve checking the driver's license, determining whether

---

[6] *Terry v. Ohio*, 392 U.S. 1 (1968).

ORDER ON SUMMARY JUDGMENT
PAGE - 7

1  there are outstanding warrants against the driver, and inspecting the automobile's registration
2  and proof of insurance." *Id.*

3  Here, Officer Serad attempted to determine A.J.'s identity and was unable to do so. This
4  was due in part to A.J.'s failure to be forthcoming about his age and possession of identification.
5  As part of his determination, Officer Serad was legally entitled to inquire as to A.J.'s
6  immigration status. *See Muehler v. Mena*, 544 U.S. 93, 100-01 (2005) (police questioning as to
7  immigration status does not constitute a seizure).

8  Plaintiffs argue that once Officer Serad discovered that A.J. was not a legal citizen, he
9  impermissibly detained A.J. for immigration purposes by calling Border Patrol. (Dkt. No. 49 at
10  18.) State police officers are not authorized to enforce federal immigration law unless there is a
11  written agreement between their office and the federal government authorizing them to do so.
12  *See* 8 U.S.C. § 1357(g)(1). However, "no written agreement is required for a state official to
13  cooperate with [federal authorities] in identifying, apprehending, and detaining any individual
14  unlawfully present in the United States." *United States v. Ovando-Garzo*, 752 F.3d 1161, 1164
15  (8th Cir. 2014); *see also* 8 U.S.C. § 1357(g)(10). Thus, regardless of whether Officer Serad
16  contacted Border Patrol to determine A.J.'s identity, (*see* Dkt. No. 28 at 3-4), or to involve
17  immigration agents in A.J.'s detainment, (*see* Dkt. No. 44 at 5), he acted within the bounds of his
18  authority and the Fourth Amendment. Plaintiffs have not shown that this was a violation of A.J.'s
19  clearly established rights.

20  *Fifth Amendment*: As to the Fifth Amendment, Plaintiffs allege that Officer Serad
21  violated A.J.'s right against self-incrimination by failing to read him his *Miranda*[7] rights before
22  asking incriminating questions. (Dkt. No. 49 at 24.) Defendants respond that the Fifth
23  Amendment does not apply to state actors. (Dkt. No. 19 at 15) (citing *Lee v. City of Los Angeles*,
24  250 F.3d 668, 687 (9th Cir. 2001)). However, the Fifth Amendment's protections apply equally

---

[7] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

to the states via the Fourteenth Amendment. *See Albright v. Oliver*, 510 U.S. 266, 272-73 (1994). Officer Serad was thus required to comply with *Miranda* despite being a state officer. Defendants make no further argument on this issue.

The privilege against compelled self-incrimination requires that law enforcement give *Miranda* warnings to an accused person prior to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A defendant is in custody if a "reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). Routine traffic stops typically do not constitute custody for the purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). However, a motorist may in some circumstances be subjected to treatment that renders him or her "in custody." *Id.* at 441.

Here, the Court concludes that the traffic stop became custodial when Officer Serad told A.J. to sit on the curb and informed A.J. that he was not free to leave. (*See* Dkt. No. 27 at 24.) However, Officer Serad ceased questioning A.J. at that point. (*See id.* at 24-26.) Thus, A.J. was not subject to custodial interrogation and *Miranda* warnings were not required. Plaintiffs have not shown that any violation of A.J.'s right against self-incrimination occurred.

*Fourteenth Amendment*: Plaintiffs further allege that Officer Serad violated A.J.'s right to equal protection under the Fourteenth Amendment. (Dkt. No. 49 at 22.) This is so, they argue, because Officer Serad "acted out of racial bias in drawing the conclusion that he did, treating and interrogating A.J. in the manner that he did, and then detaining him for purposes of turning him over to the Border Patrol and doing so." (*Id.*)

Under the Equal Protection Clause, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v.*

*Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). To avoid summary judgment, Plaintiffs must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that Officer Serad's conduct was racially motivated. *See Bingham v. City of Manhattan Beach*, 329 F.3d 723, 732 (9th Cir. 2003).

Defendants argue that there is no evidence that Officer Serad's actions were racially motivated. (Dkt. No. 19 at 12.) The Court disagrees. The evidence shows that, despite A.J.'s youthful appearance, minor traffic offense, and production of a valid home address in the area, Officer Serad repeatedly suggested that A.J. was a criminal and asked about his citizenship status. (*See also infra* section II.B.3.) A reasonable juror could find it more likely than not that this treatment was due to A.J.'s Hispanic appearance.

Regardless, however, qualified immunity bars an equal protection claim against Officer Serad on these facts. As discussed above, well-established law permits officers to determine a person's identification pursuant to a valid traffic stop, inquire as to a person's immigration status, and assist federal authorities in detaining an individual who is in the country unlawfully. Thus, even if Officer Serad treated A.J. differently because he was Hispanic, Plaintiffs have not shown that this conduct violated a clearly established right so as to defeat qualified immunity.

Defendants' motion is GRANTED as to the § 1983 claims against individual Defendants.

2. <u>Section 1983: Supervising Defendants</u>

Plaintiffs allege that Chief Cook and Mayor Linville are liable under § 1983 for their role in supervising and ratifying the individual Defendants' conduct. (Dkt. No. 1 at 17-19.) A supervisor is liable for the constitutional violations of subordinates "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor*, 880 F.2d at 1045. A governing body can be sued under § 1983 where the challenged action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). Here, where the Court found no violation of A.J.'s rights by any individual

Defendant, there is likewise no supervisory or *Monell* liability.

Defendants' motion is GRANTED as to the § 1983 claims against Chief Cook and Mayor Linville.

### 3. Racial Discrimination

Plaintiffs further allege racial discrimination in violation of the Washington Law Against Discrimination (WLAD), Washington Revised Code chapter 49.60. (Dkt. No. 1 at 19-20.) WLAD establishes the right to be free from discrimination because of membership in certain protected classes, including race. Wash. Rev. Code § 49.60.030(1). To succeed on a claim of racial discrimination under WLAD, a plaintiff "must prove that there was particularized treatment, consciously motivated by race." *Wingate v. City of Seattle,* __ F. Supp. 3d __, 2016 WL 4000935 at *6 (W.D. Wash. July 26, 2016) (internal quotations omitted). "When applied to police conduct, Washington courts look to whether the officers treated those inside a protected class equally to those outside the protected class."[8] *Id.*

Only the person injured by an alleged discrimination may bring a claim under the statute. *See* Wash. Rev. Code § 49.60.030(2). Thus, the WLAD claims by Antonio J. and Luciana Zeferino must be DISMISSED. As to A.J.'s WLAD claim, Plaintiffs allege that Officer Serad[9] discriminated against A.J. by assuming A.J. was a criminal, rather than a scared teenager; by inquiring into his immigration status; and by involving Border Patrol. (Dkt. No. 1 at 20; *see also* Dkt. No. 49 at 5-7, 30-31.)

Defendants maintain that "A.J.'s race and national origin were irrelevant to Officer Serad – what was relevant was (1) A.J.'s concealing his identity; and (2) A.J.'s admission that he was

---

[8] Defendants argue that WLAD does not create a cause of action for a traffic stop. (Dkt. No. 19 at 22.) As support, they note that the statute provides a list of protected areas, which does not include traffic stops. (*Id.*) But, as Defendants themselves point out, the list is non-exhaustive. (*Id.*) And *Wingate* explicitly applies WLAD to police conduct. *See* 2016 WL 4000935 at *6.

[9] Plaintiffs also allege that Sergeant Johnson participated in this discrimination. However, they allege no facts and provide no evidence to support that assertion.

in the country illegally and had applied for DACA status." (Dkt. No. 19 at 22-23.) This ignores the fact that A.J. did not discuss his citizenship status until Officer Serad brought it up. And, though A.J. gave a false birthday and claimed that he had a driver's license, he also gave an accurate name and address. Moreover, A.J. was evidently young and, rather than attempt to contact A.J.'s parents, Officer Serad routinely raised the possibility that A.J. was a wanted criminal or an illegal alien. These facts suggest that Officer Serad's conduct was racially motivated. In response, Defendants note that A.J.'s passenger, who is also Hispanic, was allowed to leave without incident upon providing valid identification. (Dkt. No. 19 at 23 n.9.) Thus, there is a genuine factual dispute as to whether race motivated Officer Serad's behavior.

Moreover, Plaintiffs submit evidence to suggest that Bellingham police officers treat young people differently based on their race.[10] For example, Plaintiffs provide a declaration detailing a young black man's experience being pulled over multiple times without justification. (Dkt. No. 48 at 5.) By contrast, Plaintiffs also submit evidence of an incident involving a group of white 16-year-olds who, while out joyriding and drinking, smashed into a fence post. (*See* Dkt. No. 45.) In that case, the BPD filed no criminal charges and asked no questions as to immigration status. (*See id.* at 2.) Rather, the teenagers were simply returned to their parents. (*See id.*) This evidence tends to suggest that Bellingham police officers treated A.J. and another person of color more harshly than a white person whose conduct was more severe. Thus, Plaintiffs have raised a genuine dispute of material fact as to whether the BPD has racially discriminatory practices.

Defendants' motion is DENIED as to A.J.'s racial discrimination claims against the City of Bellingham and Officer Serad. Given that no evidence was presented as to the other Defendants' behavior or involvement, the motion is GRANTED as to the racial discrimination claims against the remaining Defendants.

---

[10] The Court omits identifying details about these young people to preserve their privacy.

    4. Negligence

To establish a cause of action for negligence, a plaintiff must demonstrate that (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) damages resulted, and (4) the defendant's breach proximately caused the damages. *Tincani v. Inland Empire Zoological Soc'y*, 875 P.2d 621, 624 (Wash. 1994).

Here, Plaintiffs have not established a relevant duty. Plaintiffs allege, without legal citation, that Defendants "owed Plaintiffs a duty to use due care, and to ensure the protection of their safety and not to engage in discriminatory law enforcement against them, and protect Plaintiffs from their fellow officers at all times of the aforementioned incidents." (Dkt. No. 1 at 21.) In essence, Plaintiffs allege that Defendants breached their general duties as public servants. This claim is barred by the public duty doctrine. *See Beal for Martinez v. City of Seattle*, 954 P.2d 237, 244 (Wash. 1998) ("Under the public duty doctrine, recovery from a municipal corporation in tort is possible only where plaintiff shows that the duty breached was owed to an individual, and was not the breach of a general obligation owed to the public in general, *i.e.*, a duty owed to all is a duty owed to none.").

Defendants' motion is GRANTED as to Plaintiffs' negligence claims.

    5. Assault and Battery

Finally, Plaintiffs allege that Defendants committed assault and battery against A.J. by using excessive force during his detention. (Dkt. No. 1 at 22.) But the video evidence makes abundantly clear that no excessive force, nor any other conduct constituting assault or battery, occurred during A.J.'s stop.

Defendants' motion is GRANTED as to the assault and battery claims.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 19) is GRANTED in part and DENIED in part. The motion is DENIED as to A.J.'s WLAD claims against the City of Bellingham and Officer Serad. All other claims are DISMISSED with

1 prejudice. The Court further DENIES Defendants' request for fees and Plaintiffs' Fed. R. Civ. P. 56(c) motion.

DATED this 7th day of December 2016.

*[signature]*

John C. Coughenour
UNITED STATES DISTRICT JUDGE